## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**EVONTHE HAYES**                                        **CIVIL ACTION**

**VERSUS**                                               **NO:  14-376**

**SOUTHERN FIDELITY INSURANCE**                          **SECTION: "S" (1)**
**COMPANY**

### ORDER AND REASONS

**IT IS HEREBY ORDERED** that Southern Fidelity Insurance Company's Motion for Summary Judgment (Doc. #28) is **GRANTED** in part, as to the initial adjustment of plaintiff's claim and the September 4, 2012, proof of loss, and **DENIED** in part as to plaintiff's claim regarding the January 15, 2013, proof of loss.

**IT IS FURTHER ORDERED** that Southern Fidelity Insurance Company's Motion In Limine Regarding the Homeowners' Insurance Policy's Loss Settlement Provision and the Mold Endorsement (Doc. #27) is **DENIED**.

**IT IS FURTHER ORDERED** that Southern Fidelity Insurance Company's Motion In Limine to Exclude Expert Testimony (Doc. #26) is **DENIED**.

**IT IS FURTHER ORDERED** that Evonthe Hayes' Motion for Leave to File a Supplemental Witness List (Doc. #48) to name John Humphrey as a witness is **DENIED.**

### BACKGROUND

This matter is before the court on Southern Fidelity Insurance Company's ("SFIC") Motion for Summary Judgment regarding plaintiff's bad faith claims (Doc. #28), SFIC's Motion In Limine regarding the homeowners' insurance policy's loss settlement provision and mold endorsement (Doc.

#27)[1], and SFIC's Motion In Limine to Exclude Expert Testimony (Doc. #26).  It is also before the court on plaintiff's motion to name John Humphry as a witness after the deadline for submitting witnesses lists has passed (Doc. #48).

Plaintiff, Evonthe Hayes, owns a home located at 45 Muirfield Drive, LaPlace, Louisiana. On August 28, 2012, Hurricane Isaac made landfall, and caused wind and rain damage to Evonthe's home. At the time of the loss, the property was covered by a homeowners' insurance policy issued by SFIC.  The policy, with effective dates of February 25, 2012, to February 25, 2013, had a building damage limit of liability of $360,500, and listed Terrence and Evonthe Hayes as named insureds.

On August 31, 2012, Evonthe reported the loss to SFIC.  On September 4, 2012, Mark Sacharski with Trinity Insurance Services inspected the property on SFIC's behalf.  He estimated the value of the damages to be $48,698.08.  Sarcharski also submitted a valuation report, listing a 3,732 square feet home with a replacement cost of $246.89 per finished square foot, which resulted in an estimated replacement cost of $921,398.31. The report notes that the contact for the inspection was Terrence Hayes of Richmond, Texas, and that his ex-wife, Evonthe, was the person present during the inspection.

On September 18, 2012, SFIC issued a check for $22,711.29 to Evonthe Hayes and Terrence Hayes.  This amount was based on Sarcharski's estimate, a hurricane deductible of $7,210, and non-recoverable depreciation of $18,776.79.  The letter accompanying the check stated that the insureds

---

[1]  SFIC's Motion In Limine regarding the insurance policy's loss settlement provision and mold endorsement seeks an interpretation of the policy and an application of the facts to that interpretation.  This motion is more akin to a motion for summary judgment and will be treated as such.

were not entitled to recover depreciation due to the application of the co-insurance penalty found in the policy's loss settlement provision, because the house was not insured to at least 80% of its full replacement cost.  Terrence requested that a stop payment order be issued on the check to prevent it from being tendered without his permission.  He eventually endorsed the check, and the proceeds were placed into Evonthe's domestic attorney's trust account.

On January 15, 2013, Evonthe submitted to SFIC a report completed by Daniel Onofrey of Michaelson & Messinger Insurance Specialists, LLC regarding her property damage.  Onofrey estimated the damage to be $550,726.05.  Thereafter, SFIC sought reinspection of the property, and hired Professional Adjusting Services, Inc.  Keith Roberge, an inspector with Professional Adjusting, arranged the inspection with Terrance.  On January 25, 2013, Roberge attempted to inspect the property.  While he was there, Evonthe telephoned Onofrey, and Onofrey and David Lincoln, also from Michaelson, arrived and escorted Roberge off of the property.  Roberge's report states: "the public adjustor would not allow us to complete the re-inspection of the loss so no estimates have been prepared."  Evonthe claims that SFIC's representatives refused to schedule the inspection through Michaelson for a time when Onofrey could be available to attend.

SFIC also retained HSA Engineers & Scientists to reinspect the property.  HSA attempted to schedule the inspection through Michaelson, and telephoned Michaelson on February 14, 2013, February 15, 2013 and February 21, 2013 for that purpose.  Evonthe did not grant HSA access to the property until after her initial lawsuit was filed.

On February 7, 2013, in a letter sent by certified mail and electronic mail, SFIC requested that Evonthe submit to an examination under oath on February 27, 2013, and provide certain listed documents.  Evonthe did not attend the meeting.  On February 28, 2013, SFIC wrote to Evonthe,

requesting that she reschedule the examination under oath, and confirming that Evonthe refused access to the property to SFIC's independent adjustor and engineer. Evonthe claims that she did not receive the letters. SFIC also sought to conduct an examination under oath of Terrence, but he also failed to attend.

On May 13, 2013, Evonthe's counsel wrote to SFIC's counsel stating that she retained him, and that he "had been provided with your request to take [Evonthe's] examination under oath." The letter further stated that Evonthe "intends to cooperate with her insurer during its 'investigation' of damage to her house from Hurricane Isaac," and requested scheduling her examination under oath.

On May 23, 2013, Evonthe filed her first action against SFIC in the Fortieth Judicial District Court, Parish of St. John the Baptist, State of Louisiana, alleging that SFIC breached the insurance contract and acted in bad faith by failing to properly adjust her insurance claim and by not paying the appropriate amount under the policy. SFIC timely removed the matter to the United States District Court for the Eastern District of Louisiana alleging diversity subject matter jurisdiction under 28 U.S.C. § 1332.[2]

On May 29, 2013, SFIC's counsel wrote to Evonthe's counsel confirming their previous conversation that counsel would provide dates for her examination under oath, dates for an inspection of the property and estimates and reports from Evonthe's contractor and engineer. The letter indicated that the parties were working together to schedule the examination under oath and reinspection, and provide the relevant documentation to SFIC. Evonthe's counsel responded that he would obtain dates from her for the examination under oath, and asked for proposed dates for the inspection.

---

[2] The suit was assigned Civil Action No. 13-4824.

On June 12, 2013, Evonthe requested that SFIC participate in the insurance appraisal process provided in the policy.  SFIC refused, stating that Evonthe's request was untimely and that her chosen appraiser, Onofrey, was not an eligible appraiser.  On June 28, 2013,  Evonthe filed a motion to compel SFIC to participate in the insurance appraisal process.

On July 1, 2013, SFIC filed a motion for summary judgment arguing that Evonthe's suit should be dismissed with prejudice because she did not comply with the policy's conditions precedent to filing suit.  Particularly, the motion alleged that she refused to submit to the examination under oath, and refused access to the property to SFIC's adjustor and engineer.  Evonthe argued that she did not receive notice of the examination under oath, and that she did not refuse access to the property for inspection, but rather that the SFIC inspector came to her home unannounced.  Evonthe contended that she was willing to submit to the examination under oath and allow the reinspection of the property.

On August 2, 2013, this court denied SFIC's motion for summary judgment finding that dismissal with prejudice was unwarranted because Evonthe was willing to submit to the examination under oath, claimed she did not receive the notices, and that her delay did not prejudice SFIC. Therefore, this court dismissed the action without prejudice to allow Evonthe to comply with the conditions precedent to filing suit, namely the examination under oath and the reinspection of the property.

On August 30, 2013, HSA and U.S. Cat Adjustors reinspected the property on SFIC's behalf. Erik Moore of HSA found that the stained interior finishes and suspected microbial growth that Evonthe claims were caused by the hurricane damage due to wind and rain were actually caused by excess moisture resulting from overflow of the air conditioning condensate drain pain in the attic.

Carroll Smith of U.S. Cat did not find any additional damages to the property that were not included in Trinity's original adjustment, and found that any additional damages were more likely than not caused by the overflow of the air conditioning condensate drain pain in the attic.

On February 10, 2014, Evonthe re-filed her case against SFIC in state court. On February 18, 2014, SFIC removed the action to the United States District Court for the Eastern District of Louisiana and it was assigned Civil Action No. 14-376.  SFIC now moves for summary judgment on Evonthe's bad faith claims, a ruling that the policy's co-insurance penalty found in the loss settlement provision applies because Evonthe failed to insure the property to 80% of its full replacement cost, and that the policy's mold endorsement limits Evonthe's claims for "any and all damages associated with mold, fungi and/or bacteria" to $10,000.  SFIC further seeks to exclude the reports and testimony of Evonthe's proposed experts arguing that she failed to comply with Rule 26(a)(2) of the Federal Rules of Civil Procedure and the court's Scheduling Order.  SFIC also argues that Onofrey's estimate should be excluded because it is unsigned and does not offer sufficient opinions or conclusions, and that James G. Gilbert should be excluded from testifying because he never examined the property and relied on an inspection by Humphrey.  Hays seeks leave of court to add Humphry as a witness after the deadline for submitted witness lists has passed.

## ANALYSIS

### A.    SFIC's Motions for Summary Judgment (Docs. #28, 27)

SFIC argues that it is entitled to summary judgment on Evonthe's bad faith claims because there is no evidence that it acted arbitrarily or capriciously in adjusting her claim.  SFIC also seeks a ruling that the co-insurance penalty found in the insurance policy's loss settlement provision applies because the Hayes failed to insure the property to 80% of its full replacement cost, and that

the policy's mold endorsement limits Evonthe's claims for "any and all damages associated with mold, fungi and/or bacteria" to $10,000.[3]

### 1.  Summary Judgment Standard

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); FED. R. CIV. PROC. 56(c).  If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial.  Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986).  The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

### 2.  SFIC's Motion for Summary Judgment Regarding Plaintiff's Bad Faith Claims (Doc. #28)

SFIC argues that it is entitled to summary judgment on Evonthe's bad faith claims because there is no evidence that it acted arbitrarily or capriciously in adjusting her claim, she prevented SFIC from conducting an investigation into her claim and because SFIC has a good faith coverage dispute.

---

[3]   As stated above, SFIC's Motion In Limine regarding the insurance policy's loss settlement provision and mold endorsement will be treated as a motion for summary judgment.

Louisiana Revised Statutes §§ 22:1892 and 22:1973 penalize insurers who arbitrarily and capriciously fail to pay legitimate claims.  La. Rev. Stat. § 22:1892 provides that a property insurer "shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss[4] from the insured or any party in interest," and "shall make a written offer to settle any property damage claim, . . ., within thirty days after receipt of a satisfactory proofs of loss of that claim." La. Rev. Stat. § 22:1892(A)(1) & (4).  The statute also provides that the insurer must initiate loss adjustment of a property damage claim within fourteen days after notification of the loss by the claimant, or within thirty days of notification in the case of a catastrophic loss.  Id. at § 22:1892(A)(3).  If the insurer fails to comply with its obligations under Subsection A, and "such failure is found to be arbitrary, capricious, or without probable cause," the insurer is subjected "to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured . . . as well as reasonable attorney fees and costs." Id. at § 22:1892(B)(1).

Similarly, La. Rev. Stat. § 22:1973 provides, in pertinent part:

> A.  An insurer, . . ., owes to his insured a duty of good faith and fair dealing.  The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the

---

[4] The Supreme Court of Louisiana has stated:

> [I]t is well settled that a satisfactory proof of loss is only that which is sufficient to fully apprise the insurer of the insured's claims.  In addition, with regard to the form of a proof of loss, this court has stated that proof of loss is a flexible requirement to advise an insurer of the facts of the claim, and that it need not be in any formal style.  As long as the insurer receives sufficient information to act on the claim, the manner in which it obtains the information is immaterial.

La. Bag Co., Inc. v. Audubon Indem. Co., 999 So.2d 1104, 1119 (La. 2008) (citations and quotations omitted).

insured or the claimant, or both.  Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

B.   Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties in Subsection A of the Section:[5]

\*       \*       \*

(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of a satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.[6]

---

[5] Evonthe claims that Subsection B(1) applies to this case.  Subsection B(1) imposes liability under the statue on an insurer for "[m]isrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue." LA. REV. STAT. § 22:1973(B)(1). "Misrepresentation can occur when an insurer either makes untrue statements to an insured concerning pertinent facts or fails to divulge pertinent facts to the insured." McGee v. Omni Ins. Co., 840 So.2d 1248, 1256 (La. Ct. App. 2003).  The Louisiana intermediate appellate courts disagree about whether the misrepresentation must relate to a coverage issue.  The Louisiana Court of Appeal, Fourth Circuit and the Louisiana Court of Appeal, Second Circuit, have held that Subsection B(1) applies only if the insurer misrepresents the coverage provided by the insurance policy. Talton v. USAA Cas. Ins. Co., 981 So.2d 696, 709-10 (La. Ct. App. 2008); Strong v. Farm Bureau Ins. Co., 743 So.2d 949, 953 (La. Ct. App. 1999).  However, the Louisiana Court of Appeal, Third Circuit has held that an insurer can be liable for non-coverage-related misrepresentations or nondisclosures. Arvie v. Safeway Ins. Co. of La., 951 So.2d 1284, 1286 (La. Ct. App. 2007); McGee v. Omni Ins. Co., 840 So.2d 1248, 1256 (La. Ct. Appl. 2003).   Thus,  the United States Court of Appeals for the Fifth Circuit recently certified the following question to the Supreme Court of Louisiana: "Can an insurer be found liable under Section 22:1973(B)(1) for misrepresenting or failing to disclose facts that are not related to the insurance policy's coverage?" Kelly v. State Farm Fire & Cas. Co., 2014 WL 4437666, at \*6 (5th Cir. 9/10/2014).  Regardless of the answer to that question, Subsection B(1) does not apply to this case. Evonthe claims that SFIC fabricated a coverage dispute after Moore of HSA and Smith with U.S. Cat inspected the property on August 30, 2013.  Evonthe does not agree with their determinations regarding the cause of the loss, but Moore's and Smith's opinions are clearly stated in their reports.  There is no indication that SFIC misrepresented to Evonthe the opinions or the facts as Moore and Smith found them.  Moreover, Evonthe does not allege that SFIC made any misrepresentations to her regarding the insurance policy's stated coverages.  Therefore, La. Rev. Stat. §22:1973(B)(1) is inapplicable.

[6] Evonthe cites Subsection B(6), which renders an insurer liable for the penalties under La. Rev. Stat. §22:1973 if it arbitrarily, capriciously or without probable cause fails to pay a claim pursuant to La. Rev. Stat. § 22:1893.  Section 22:1893 prohibits a homeowners' insurer from: (1) using a floodwater mark, without considering other evidence, to determine whether a loss is covered; or, (2) using the fact that a home is removed or displaced from its foundation, without considering other evidence, to determine whether a loss is covered.  Floodwater and removal or displacement form the foundation are not at issue in this case.  Thus, La. Rev. Stat. §22:1973(B)(6) is inapplicable.

*     *     *

> C. In addition to any general or special damages to which the claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

"The first sentence of Subsection A of the statute recognizes the jurisprudentially established duty of good faith and fair dealing owed to the insured, which is an outgrowth of the contractual and fiduciary relationship between the insured and the insurer." Theriot v. Midland Risk Ins. Co., 694 So.2d 184, 187 (La. 1997) (citing Holtzclaw v. Falco, Inc., 355 So.2d 1279 (La. 1978)). Because the statute does not create the insured's cause of action against the insurer, "the bases for an insured's cause of action for a breach of the implied covenant of good faith and fair dealing are not limited to the prohibited acts listed in [La. Rev. Stat. § 22:1973(B)]."[7] Stanley v. Trinchard, 500 F.3d 411, 427 (5th Cir. 2007).

The Supreme Court of Louisiana has observed that the conduct prohibited by La. Rev. Stat. §§ 22:1892(A)(1) and 22:1973(B)(5), "the failure to timely pay a claim after receiving satisfactory proof of loss when the failure to pay is arbitrary, capricious, or without probable cause," is "virtually identical." Reed v. State Farm Mut. Auto. Ins. Co., 857 So.2d 1012, 1020 (La. 2003). A plaintiff

---

[7] In Kelly, 2014 WL 4437666, at *3, the United States Court of Appeals for the Fifth Circuit recognized that two Louisiana intermediate appellate court cases held that the insured's claims for bad faith against an insurer are limited to the items enumerated in La. Rev. Stat. § 22:1973(B). See Arvie, 951 So.2d at 1285; McGee, 840 So.2d at 1253-56. The court noted that those cases predated Stanley, and that there have been no other new state law developments since Stanley. Id. Thus, the court concluded "because this court's precedent on this matter is clear, we must assume that an insured can pursue a cause of action against an insurer for a generalized breach of the duty of good faith and fair dealing." Id. However, the court noted that the Supreme Court of Louisiana could correct the United States Court of Appeals for the Fifth Circuit if it is incorrect on this point. Id. at *6 n. 3.

10

may be awarded penalties under only one of the two provisions, §§ [22:1892 and 22:1973], whichever is greater," but the plaintiff may "seek attorneys' fees under § [22:1892] while seeking damages and penalties under § [22:1973]." Dickerson v. Lexington Ins. Co., 556 F.3d 290, 297 (5th Cir. 2009). Both statutes must be strictly construed because they are penal in nature. Reed, 857 So.2d at 1020.

To recover penalties under either statute for an insurer's failure to timely pay a claim, the insured must prove: (1) that the insurer received a satisfactory proof of loss; (2) that the insurer failed to pay the claim within the applicable statutory period; and, (3) that the insurer's failure to pay was arbitrary, capricious or without probable cause. Dickerson, 556 F.3d at 297.  Courts interpret the phrase "arbitrary and capricious" as synonymous with "vexatious." Id. "'[V]exatious refusal to pay' means unjustified, without reasonable or probable cause or excuse." Id. (quoting Reed, 857 So.2d at 1021).

"An insurer does not act arbitrarily or capriciously, . . . when it withholds payment based on a genuine (good faith) dispute about the amount of loss or the applicability of coverage." Id. (citing Calogero v. Safeway Ins. Co. of La., 753 So.2d 170, 174 (La. 2000)). "An insurer's conduct depends on the facts known to the insurer at the time of its action, and [the Supreme Court of Louisiana] has declined to assess penalties 'when the insurer has a reasonable basis to defend the claim [such as reasonable and legitimate questions as to the extent of its liability or the loss] and acts in good-faith reliance on that defense.'" La. Bag, 999 So.2d at 1114 (quoting Reed, 857 So.2d at 1021).  Bad faith penalties cannot be imposed on an insurer "simply because it eventually turned out to be wrong about the cause of the damage." Kodin v. State Farm Fire and Cas. Co., 314 Fed. Appx. 671, 679 (5th Cir. 2009) (citing Icklone v. Travelers Indem. Co., 345 So.2d 202, 203 (La. Ct. App. 1977)

("Penalties may not be assessed merely because the insurer is the unsuccessful litigant in a lawsuit.")).  However, the insurer must pay any undisputed amount, or, where the exact extent of the damage is unclear, any reasonable amount due, within the statutorily prescribed period in order to avoid penalties under the statutes. La. Bag, 999 So. 2d at 1114-15.  On the other hand, "an insured who fails to provide his insurer with information required to process his claim cannot then claim the insurer acted arbitrarily in delaying payment." Dickerson, 556 F.3d at 299.

The insured bears the burden of proof, and the penalties imposed by the statutes "are not assessed unless a plaintiff's proof is clear that the insurer was in fact arbitrary, capricious, or without probable cause in refusing to pay." Reed, 857 So.2d at 1021.  Penalties and attorneys' fees should be imposed only "when the facts 'negate probable cause for nonpayment.'" La. Bag, 999 So.2d at 1114 (quoting Gillory v. Travelers Ins. Co., 294 So.2d 215, 217 (La. 1974)).  Whether an insurer acted in good or bad faith is a factual, not legal determination. Dickerson, 556 F.3d at 300.

In this case, SFIC's obligations under La. Rev. Stat. § 22:1892 were first triggered when Evonthe reported the loss to SFIC on August 31, 2012.  Under the statute, SFIC was then required to initiate the loss adjustment within fourteen days of the notification, and pay any undisputed amounts and make a written offer to settle the claim within thirty days of the receipt of a satisfactory proof of loss. LA. REV. STAT. § 22:1892(A).  Sarcharski's inspection of the property on September 4, 2012, constitutes a proof of loss. Korbel v. Lexington Ins. Co., 308 Fed. Appx. 800, 804 (5th Cir. 2009) (an insurer's adjustor's inspection of the damaged property can serve as a satisfactory proof of loss); see also Jonesboro Lodge v. Am. Cent. Ins. Co., 49 So.2d 740, 744 (La. 1950) (noting that proof of loss from the insured was unnecessary to hold the insurer liable for statutory penalties, where the insurer made an investigation and adjustment of the claim).  Receipt of this proof of loss

triggered SFIC's obligation under La. Rev. Stat. § 22:1973(B)(5) to pay the undisputed amount of the claim within sixty days.   On September 18, 2012, SFIC issued a check to both of the named insureds, Evonthe and Terrence Hayes, in the amount of loss stated in Sarcharski's report, minus the hurricane deductible and non-recoverable depreciation.[8]   Therefore, SFIC fulfilled its statutory obligations under La. Rev. Stat. §§ 22:1892(A) and 22:1973(B)(5) with respect to the initial adjustment and payment of the claim based on the Sarcharski's September 4, 2012, report, and there can be no bad faith under the statutes related to the initial adjustment of the claim or the September 4, 2012, proof of loss.   Summary judgment is GRANTED in part as to this bad faith claim based on the initial adjustment and payment following the September 4, 2012, proof of loss.

SFIC's obligations under La. Rev. Stat. §§ 22:1892(A) and 22:1973 were again triggered on January 15, 2014, when it received Onofrey's report which stated that the amount of Evonthe's property damage was $550,726.05. La. Bag, 999 So.2d at 1119 ("[A] satisfactory proof of loss is only that which is sufficient to fully apprise the insurer of the insured's claims," and "it need not be in any formal style.").   It is undisputed that SFIC did not make any payments to Evonthe on this proof of loss within the statutory periods.   However, to recover bad faith penalties, Evonthe must prove that SFIC's failure to pay was arbitrary, capricious or without probable cause. Dickerson, 556 F.3d at 297.   SFIC's non-payment cannot be considered arbitrary or capricious if it was based on a good faith dispute about the amount of the loss or applicability of coverage. Id.  Further, SFIC's non-payment after it received Onofrey's report cannot be considered arbitrary if Evonthe is found to have prevented SFIC from acquiring information required to re-adjust the claim. Id. at 299.

---

[8] Terrence's actions regarding the stop-payment order and endorsement of the check due to the couple's divorce proceedings are not attributable to SFIC.

In this case, there are many genuine issues of material fact regarding whether there was a good faith dispute about the amount of coverage and whether SFIC and Evonthe acted in good faith in re-adjusting the claim after SFIC received Onofrey's report.  SFIC and Evonthe both contend that the other party failed to cooperate and prevented the re-adjustment of the claim.  Evonthe also argues that, once SFIC was able to reinspect the property, it "created" a coverage dispute that she claims is not in good faith.  Further, there are questions regarding whether SFIC's alleged conduct after receiving Onofrey's report exposed it to penalties under La. Rev. Stat. § 22:1973 by breaching the implied covenant of good faith and fair dealing. See Stanley, 500 F.3d at 427. All of these issues are fact intensive and cannot be resolved on summary judgment.  Dickerson, 556 F.3d at 300 (acting in good or bad faith is a factual, not legal determination). Therefore, SFIC's motion for summary judgment seeking dismissal of Evonthe's bad faith claims other than those related to the initial adjustment and payment following the September 4, 2012, proof of loss is DENIED.

**3. SFIC's Motion Regarding the Insurance Policy's Loss Settlement Provision and Mold Endorsement (Doc. #27)**

SFIC seeks a ruling that the co-insurance penalty found in the insurance policy's loss settlement provision applies because the Hayes failed to insure the property to 80% of its full replacement cost, and that the policy's mold endorsement limits Evonthe's claims for "any and all damages associated with mold, fungi and/or bacteria" to $10,000.

**a. Insurance Policy Interpretation**

An insurance policy is a contract, and its interpretation is a question of law. See Jarvis Christian Coll. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 197 F.3d 742, 746 (5th Cir. 2000). Under Louisiana law, insurance policies are construed by applying the general rules of contract interpretation set forth in the Louisiana Civil Code. La. Ins. Guar. Ass'n v. Interstate Fire & Cas.

14

Co., 630 So.2d 759, 763 (La. 1994).  The intent of the parties as reflected in the policy determines the extent of the coverage. Id. (citing LA. CIV. CODE art. 2045 (defining contractual interpretation as "the determination of the common intent of the parties"); Garcia v. St. Bernard Parish Sch. Bd., 576 So.2d 975, 976 (La. 1991)).  The words of an insurance policy are given their "general, ordinary, plain, and proper meaning . . . unless [they] have acquired a technical meaning." Id. (citing LA. CIV. CODE art. 2047; Breland v. Schilling, 550 So.2d 609, 610 (La. 1989); Capital Bank & Trust Co. v. Equitable Life Assur. Soc'y of U.S., 542 So.2d 494, 497 (La. 1989)).

When the language is clear and unambiguous, it must be enforced as written. See Reynolds v. Select Props. Ltd., 634 So.2d 1180, 1183 (La.1994).  "When the words of the contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046. "A contract provision is not ambiguous where only one of two competing interpretations is reasonable or merely because one party can create a dispute in hindsight." Amoco Prod. Co. v. Tx. Meridian Res. Exploration Inc., 180 F.3d 664, 668-69 (5th Cir. 1999) (quoting Tx. E. Transmission Corp. v. Amerada Hess Corp., 145 F.3d 737, 741 (5th Cir. 1998)) (internal quotation marks omitted).   If there is an ambiguity in the policy of insurance, the ambiguous provision is construed against the insurer because it is the party who furnished the text. LA. CIV. CODE ANN. art. 2056.

### b. The Loss Settlement Provision

The homeowners' insurance policy at issue provides, in pertinent part:

> **5.    Loss Settlement.**   Covered property losses are settled as follows:
>
> *      *      *

15

**b.** If, at the time of the loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace with material of like kind and quality, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

**(a)** The limit of liability under this policy that applies to the building;

**(b)** The replacement cost of that part of the building damaged for like kind and quality on the same premises; or

**(c)** The necessary amount actually spent to repair or replace the damaged building.

**(2)** If, at the time of the loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

**(a)** The actual cash value of that part of the building damaged; or

**(b)** That portion of the cost to repair or replace, after application of deductible and without deduction for depreciation, that part of the building damaged, which the total amount of the insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

**(3)** To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

**(a)** Excavations, foundations, piers or any supports which are below the undersurface of the lowest basement floor;

16

**(b)** Those supports in **(a)** above which are below the surface of the ground inside the foundation walls, if there is no basement; and

**(c)** Underground flues, pipes, wiring and drains.

SFIC argues that the co-insurance penalty stated above applies because the property was not insured to 80% of its full replacement cost.  As evidence of the full replacement cost, SFIC points to Sarcharski's post-loss valuation report where he found that the property was 3,732 square feet, with a replacement cost of $921,398.31. Thus, SFIC argues that the co-insurance penalty applies, and Evonthe's payment under the policy is limited as described in Section 5(b)(2).

Evonthe argues that the property was insured to 80% of its full replacement cost as reflected in the insurance application.  She contends that the insurance application states that the 3650 square feet home had a replacement cost of $403,000.  Evonthe points out that the homeowners' insurance policy's limit of liability for building damage, $360,500, was within 80% of $403,000, thus the co-insurance penalty does not apply.  She also argues that Sarcharski's valuation estimate is unreliable because he has no prior knowledge of home construction or repair in Louisiana and used a software program that determined the pricing of the replacement cost.  Further, Evonthe argues that, under jurisprudence form another section of this court, SFIC is incorrectly interpreting the co-insurance penalty, and that the penalty should be applied to the actual cash value to repair the damage, which is contested by the parties.

### i.   Using of Post-Loss Valuation to Determine the Applicability of the Co-Insurance Penalty

In Shamsnia v. Lexington Ins. Co., 2007 WL 4218953 (E.D. La. 11/29/2007) (Vance, J.), the court considered the application an identical insurance provision.  Lexington claimed that the property was not insured to 80% of its full replacement cost because, after the loss, the adjustor

appraised the full replacement cost of plaintiffs' house to be $1,738,905.03, and the homeowners' insurance policy's limit of liability for building damage was $894,500. Id. at *2.  Plaintiffs argued that the their home was insured for its full replacement cost because the insurance application appraisal, completed at Lexington's request prior to underwriting the policy, stated the replacement cost of the property was $894,500. Id.  The court found that the settlement condition terms of the policy are unambiguous and specifically stated that "[i]f at the time of the loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss," then the insurer will apply the co-insurance penalty. Id. at *4. "Thus, to determine whether plaintiffs are sufficiently insured for [the provision] to apply, plaintiffs' policy limit must be compared with the pre-loss full replacement cost of their home." Id.

The policy language at issue in this case is identical to that in Shamsnia.  Applying the reasoning in Shamsnia, to determine whether the co-insurance stated in Subsection 5(b)(2) applies to Evonthe's claim, SFIC must compare the policy limit with a pre-loss value of the full replacement cost, not the post-loss amount stated by Sarcharski's valuation report.  Therefore, Sarcharski's valuation report is irrelevant to determining the pre-loss value of the home's full replacement cost, and Evonthe's arguments regarding Sarcharski's qualifications to issue the report are rendered moot.

However, the insurance application evidence submitted by Evonthe may not be sufficient to establish the pre-loss valuation.  The application states that the property is a single story home, but the property at issue is a two story home, and the photographs accompanying the insurance application are of a different house than those attached to the adjustors' reports.  Therefore, there are genuine issues of material fact regarding the proper pre-loss valuation of Evonthe's home, and

SFIC's motion regarding the application of the co-insurance penalty in the homeowners' insurance policy's loss settlement provision is DENIED.

### ii.   Interpretation of the Co-Insurance Penalty

Evonthe argues that, if the home was under-insured and the co-insurance penalty applies, the amount of the co-insurance penalty cannot be determined until the actual cash value of the repairs is known.

In <u>Rogers v. S. Fid. Ins. Co.</u>, Civil Action No. 13-5695 (E.D. La. 6/19/2014) (Fallon, J.), SFIC argued that the co-insurance penalty found in the loss settlement provision of its homeowners' insurance policy applied, and limited plaintiff's recovery to 65% of the policy limit. Plaintiff agreed that the home was under-insured, but challenged SFIC's interpretation of the policy provision. Plaintiff argued that the terms of the loss settlement provision did not call for a reduction in the policy limit. <u>Id.</u> The court found that "Section 5(b)(2) clearly states that in the event of under-insurance, the insured will receive the greater of two options, up to the policy limit. <u>Id.</u> The first of these amounts is the actual cash value of the damaged portion of the building," and the second is "some portion of the replacement cost." <u>Id.</u> The court concluded that because the actual cash value of the damage and the replacement cost were disputed, it could not determine how the policy provision would apply, but the policy did not call for a per se reduction in the policy limit due to the home being under-insured because the co-insurance provision specifically caps recovery at "the limit of liability under this policy that applies to the building." <u>Id.</u>

In this case, the actual cash value of the damage and the replacement cost are contested. Further, there are outstanding issues of fact regarding the proper pre-loss valuation of Evonthe's home. Thus, the court cannot determine if or how the co-insurance penalty might apply in this case.

### c.   The Mold Exclusion and Endorsement

The homeowners' insurance policy at issue defines ""Fungi" and "Bacteria" as:

> **"Fungi"**
>     **a.** "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

*     *     *

> **"Bacteria"**
>     **a.** "Bacteria means any type, kind or form of bacteria.

The policy contains the following exclusion regarding "fungi", wet or dry rot, or bacteria:

> **A.** We do not insure for loss caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

*     *     *

> **11. "Fungi", Wet Or Dry Rot, Or Bacteria**
>
> "Fungi", Wet Or Dry Rot, Or Bacteria meaning, the presence, growth, proliferation, spread or any activity of "fungi", wet or dry rot, or bacteria.
>
> This Exclusion does not apply:
>
>     **a.** when "fungi", wet or dry rot, or bacteria results from fire or lightning: or
>
>     **b.** To the extent coverage is provided for in Other Coverages, "Fungi", Wet Or Dry Rot, Or Bacteria with respect to loss caused by a Peril Insured Against other than fire or lightning.
>
> Direct loss by a Peril Insurance Against resulting from "fungi", wet or dry rot, or bacteria is covered.

20

In "Other Coverages," the homeowners' insurance policy adds limited coverage for "fungi", wet or dry rot or bacteria, as follows:

### "Fungi", Wet Or Dry Rot, Or Bacteria

**a.** The amount show on the Schedule above [$10,000] is the most we will pay for:

    **(1)** The total of all loss payable under Property Coverages caused by "fungi", wet or dry rot, or bacteria;

    **(2)** The cost to remove "fungi", wet or dry rot, or bacteria from covered property;

    **(3)** The cost to tear out and replace any part of the building or other covered property as needed to gain access to the "fungi", wet or dry rot, or bacteria; and

    **(4)** The cost of testing of air or property to confirm the absence, presence or level of "fungi", wet or dry rot, or bacteria whether performed prior to, during or after removal, repair, restoration or replacement.  The cost of such testing will be provided only to the extent that there is a reason to believe that there is the presence of "fungi", wet or dry rot, or bacteria.

**b.** The coverage described in **a.** above only applies when such loss or cost are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred.

**c.** The **Each Covered Loss** amount shown in the Schedule for ths coverage is the most we will pay for the total of all loss or costs payable under this Other Coverage for all covered losses, regardless of the number of locations insured under this endorsement or the number of claims made.

**d.** The **Policy Aggregate** amount shown in the Schedule for this coverage is the most we will pay for the total of all loss or costs payable under this Other Coverage for all covered losses, regardless of the number of locations insured under this endorsement or number of claims made.

**e.**   If there is a covered loss or damage to covered property, not caused, in whole or in part, by "fungi", wet or dry rot, or bacteria, loss payment will not be limited by the terms of this Other Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the loss.  Any such increase in the loss will be subject to the terms of this Other Coverage.

SFIC argues that the application of the above quoted policy provisions means that "plaintiff's claims associated in any form or fashion due to mold, fungus or bacteria are limited to $10,000." Evonthe argues that her damages are not limited because the damage was caused by Hurricane Isaac's wind and rain, and the mold grew on that existing damage.

In Orleans Parish Sch. Bd. v. Lexington Ins. Co., 123 So.3d 787 (La. Ct. App. 2013), the Louisiana Court of Appeal, Fourth Circuit examined the meaning of similar insurance policy provisions that excluded coverage for damages "caused by" mold.  The court found that the phrase "caused by" meant "that there is a distinction between mold as a loss and mold as a cause of the loss that must be recognized." Id. at 796.  In that vein, the court recognized that:

the growth of mold is usually sparked by some moisture-related trigger, whether a covered event or not.  Therefore, the [question rooted in linear analysis is]: are there any damages along the sequential chain of losses caused wholly or in part by mold?  In other words, once mold appears – for whatever reason – what additional damages can be attributed in some way to the presence of the mold? It is these damages that . . . the mold exclusion prohibiting recovery for damages "caused by" mold are designed to address.

\*        \*        \*

Mold can presumably always be attributed to something.   The moisture sparking the growth of mold has to come from somewhere. What the mold exclusion instead limits is coverage for damage that is attributed to the mold itself, rather than to the initially covered peril.

Using this analysis, once mold develops, the question of whether mold, as the damage itself, is covered is an inquiry into whether what

22

led to the development of mold is a covered loss under the policy. If the event triggering the growth of mold is a covered loss under the insurance policy, then the mold is also covered and the question becomes: what other damages have resulted solely as a result of the mold which would not have been present but-for the presence of mold. Conversely, if the triggering event is not a covered loss, then both the mold itself, and any resulting damages would likely be excluded from coverage.

Id. at 797.

The mold exclusion and endorsement in Evonthe's homeowners' insurance policy must be read together. The exclusion precludes coverage for "loss caused directly or indirectly by" "fungi", wet or dry rot, or bacteria, but does not apply "[t]o the extent coverage is provided for in Other Coverages, "Fungi", Wet Or Dry Rot, Or Bacteria with respect to loss caused by a Peril Insured Against other than fire or lightning," or "[d]irect loss by a Peril Insurance Against resulting from "fungi", wet or dry rot, or bacteria." Further, the mold endorsement provides for $10,000 worth of coverage for "all loss payable under Property Coverages caused by "fungi", wet or dry rot, or bacteria," and various types of remediation. However, the limited coverage "only applies when such loss or cost are a result of a Peril Insured Against that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at and after the time the Peril Insured Against occurred," but if the property sustains a covered loss or damage "not caused, in whole or in party, by "fungi" wet or dry rot, or bacteria, loss payment will not be limited by the terms of this Other Coverage, except to the extent that "fungi", wet or dry rot, or bacteria causes an increase in the loss."

The terms of the mold exclusion and endorsement in Evonthe's homeowners' insurance policy comport with the analysis in Orleans Parish Sch. Bd. because both address losses "caused by" mold, fungi, wet or dry rot or bacteria. Importantly, within the mold exclusion clause, the policy

23

at issue reinstates coverage if the loss was first "caused by" a peril insured against, and then coverage is limited in the endorsement only to the extent that the "fungi", wet or dry rot or bacteria causes an increase in the loss.  These policy provisions are consistent with the linear analysis questions the <u>Orleans Parish Sch. Bd.</u> court state are appropriate: "[A]re there any damages along the sequential chain of losses caused wholly or in part by mold?  In other words, once mold appears – for whatever reason – what additional damages can be attributed in some way to the presence of the mold?" or "what other damages have resulted solely as a result of the mold which would not have been present but-for the presence of mold[?]" <u>Id.</u>

SFIC seeks a declaration that all of plaintiff's mold related claims are limited to $10,000 under the endorsement.  Applying the policy language and the analysis in <u>Orleans Parish Sch. Bd.</u>, which limit recovery for only that damage that would not have occurred but-for the presence of mold, reveals that the analysis is not that simple.  Instead, SFIC will have to prove that any damage it seeks to exclude would not have occurred but-for the presence of mold. <u>See</u> <u>Dickerson</u>, 556 F.3d at 295 (the insurer bears the burden of proving that an otherwise covered damage falls within an applicable exclusion).

Therefore, in this case, there are genuine issues of material fact regarding which property damage caused by hurricane winds and rains, regardless of whether mold grew on that damage due to the moisture, and what damage would not have occurred but-for the presence of mold.  Moreover, there are factual issues regarding whether Evonthe took all reasonable means to save and preserve the property after the hurricane damage was sustained to prevent further damage, as required by the endorsement.  If not, there is no limited coverage under the endorsement for the damage that would not have occurred but-for the presence of mold.  Due to the numerous factual issues that affect the

applicability of the mold exclusion and endorsement, SFIC's motion regarding the mold endorsement

is DENIED.

**B.      SFIC's Motion In Limine to Exclude Expert Testimony**

SFIC seeks to exclude the reports and testimony of Evonthe's proposed experts, Onofrey,

Julie Murphy and James G. Gilbert, arguing that Evonthe failed to comply with Rule 26(a)(2) of the

Federal Rules of Civil Procedure and the court's Scheduling Order by failing to submit a list of cases

that the proposed experts have testified in, their expert fees, and a list of any and all qualifications

to provide expert testimony by August 8, 2014, the date provided in the Scheduling Order.   SFIC

also argues that Onofrey's estimate should be excluded because it is unsigned and does not offer

sufficient opinions or conclusions as required by Rule 702 of the Federal Rules of Evidence and

<u>Daubert v. Merrell Dow Pharm.</u>, 113 S.Ct. 2786, 2795 (1993).  SFIC contends that Onofrey's report

is an inflated estimate that will not help the trier of fact.   Further, SFIC argues that Gilbert should

be precluded from testifying because he did not personally inspect the property.

**1.      Rule 26(a)(2) of the Federal Rules of Civil Procedure and the Court's Scheduling Order**

Rule 26(a)(2) of the Federal Rules of Civil Procedure provides:

> **(2)** *Disclosure of Expert Testimony.*
>
> (A) *In General.* In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.
>
> (B) *Witnesses Who Must Provide a Written Report.* Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report--prepared and signed by the witness--if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the

party's employee regularly involve giving expert testimony. The report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii) the facts or data considered by the witness in forming them;

> (iii) any exhibits that will be used to summarize or support them;

> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

> (vi) a statement of the compensation to be paid for the study and testimony in the case.

*        *        *

(D) *Time to Disclose Expert Testimony*. A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

> (i) at least 90 days before the date set for trial or for the case to be ready for trial; or

> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

(E) *Supplementing the Disclosure*. The parties must supplement these disclosures when required under Rule 26(e).

Rule 37(c) of the Federal Rules of Civil Procedure provides the consequences of a party's

non-compliance with Rule 26(a):

26

**(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.**

**(1)** ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

**(A)** may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

**(B)** may inform the jury of the party's failure; and

**(C)** may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

To determine whether a violation of Rule 26 is harmless under Rule 37(c), the court considers: (1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and, (4) the explanation for the party's failure to disclose. Tex. A&M Research Found. v. Magna Transp., Inc., 338 F.3d 394, 402 (5th Cir. 2003).

SFIC contends that Evonthe's experts should be excluded for her failure to disclose a list of cases in which the proposed experts have testified, their expert fees, and a list of any and all qualifications to provide expert testimony by August 8, 2014, the date provided in the Scheduling Order.  SFIC states that it was prejudiced in preparing for depositions without this information. Evonthe does not explain why she failed to disclose this information, but argues that excluding the experts would be extreme because she identified them and produced their reports to SFIC timely. Although the information omitted by Evonthe is required by Rule 26(a)(2) and is certainly important, SFIC has not articulated a specific prejudice that would justify excluding the experts from

testifying at trial. Therefore, the omission was harmless, and SFIC's motion is DENIED as to excluding the experts for non-compliance with the technical terms of Rule 26(a)(2).

### 2. Rule 702 of the Federal Rules of Evidence and <u>Daubert</u>

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. <u>Gen. Elec. Co. v. Joiner</u>, 118 S.Ct. 512, 515 (1997). Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if 1) the testimony is based upon sufficient facts or data, 2) the testimony is the product of reliable principles and methods, and 3) the witness has applied the principles and methods reliably to the facts of the case.

In <u>Daubert</u>, 113 S.Ct. at 2795, the Supreme Court of the United States held that Rule 702 requires the district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." To perform its gatekeeping function, the court must first determine whether the proffered expert testimony is reliable. The party offering the testimony bares the burden of establishing its reliability by a preponderance of the evidence. <u>See</u> <u>Moore v. Ashland Chem. Inc.</u>, 151 F.3d 269, 276 (5th Cir. 1998). The reliability inquiry requires the court to assess whether the reasoning or methodology underlying the expert's testimony is valid. <u>See</u> <u>Daubert</u>, 113 S.Ct. at 2796. The goal is to exclude expert testimony that is based merely on subjective belief or unsupported speculation. <u>See</u> <u>id.</u> at 2795. Next, the court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, i.e. whether it is relevant. <u>See</u> <u>id.</u> at 2795-96.

Rule 702 also requires that an expert be properly qualified.  Generally, if there is some reasonable indication of qualifications, the court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. Rushing v. Kansas City S. Ry. Co., 185 F.3d 496 (5th Cir. 1999).  A witness qualified as an expert is not strictly confined to his area or practice, but may testify regarding related applications, rather "a lack of specialization does not affect the admissibility of the opinion, but only its weight." Wright v. John Deere Co., 935 F.2d 1090, 1100 (10th Cir. 1991).

SFIC argues that Onofrey's report should be excluded because it is an inflated estimate that will not help the trier of fact.  SFIC contends that the report does not account for the cost of actual repairs that were completed to the property and does not state clear opinions as to how the amounts of damage stated in the report were reached.  SFIC's also argues that Gilbert should be prevented from testifying because he did not personally inspect the property.

Onofrey's estimate is reliable and relevant.  He is a licensed contractor and experienced in insurance loss adjustment.  His report clearly states his opinions as to the amount of losses Evonthe's property incurred, and will assist the trier of fact in determining those amounts.  Further, SFIC does not argue that Gilbert is unqualified, only that his testimony should be excluded because he did not personally inspect the property.  SFIC's concerns about Onofrey's and Gilbert's reports and opinions can be addressed on cross-examination and the presentation of countervailing expert testimony.  Thus, SFIC's motion in limine to exclude Onofrey and Gilbert based on Rule 702 and Daubet is DENIED.

**C.     Plaintiff's Motion for Leave to File Supplemental Witness List (Doc. #48)**

On September 16, 2014, Evonthe filed a motion for leave to supplemental her witness list to add John Humphrey as a fact witness. Humphrey inspected the property and Gilbert relied on Humphrey's inspection in completing his report. This court's Scheduling Order set August 8, 2014, as the deadline for filing witness lists. Because Evonthe's motion to supplement her witness list was filed more than a month after the deadline for filing witness lists, her motion is DENIED.

## CONCLUSION

**IT IS HEREBY ORDERED** that Southern Fidelity Insurance Company's Motion for Summary Judgment (Doc. #28) is **GRANTED** in part, as to the initial adjustment of plaintiff's claim and the September 4, 2012, proof of loss, and **DENIED** in part as to plaintiff's claim regarding the January 15, 2013, proof of loss.

**IT IS FURTHER ORDERED** that Southern Fidelity Insurance Company's Motion In Limine Regarding the Homeowners' Insurance Policy's Loss Settlement Provision and the Mold Endorsement (Doc. #27) is **DENIED**.

**IT IS FURTHER ORDERED** that Southern Fidelity Insurance Company's Motion In Limine to Exclude Expert Testimony (Doc. #26) is **DENIED**.

**IT IS FURTHER ORDERED** that Evonthe Hayes' Motion for Leave to File a Supplemental Witness List (Doc. #48) to name John Humphrey as a witness is **DENIED.**

New Orleans, Louisiana, this  15th  day of October, 2014.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**